IDA RINGLING NORTH and JOHN NORTH, as Executors, etc., v. EMILY RINGLING.

IDA RINGLING NORTH and JOHN NORTH, as Executors, etc., v. EMILY RINGLING.

EMILY RINGLING v. IDA RINGLING NORTH and JOHN NORTH, as Executors, etc.

EMILY RINGLING v. IDA RINGLING NORTH and JOHN NORTH, as Executors, etc.

7 So. (2nd) 476                                    En Banc
August 2, 1940          Adhered to On Rehearing April 3, 1942

740

Milam, McIlvaine & Milam, for appellant.

George Couper Gibbs, Attorney General, and John L. Graham, Assistant Attorney General, for the State.

Henry L. Williford, James E. Kirk, John F. Burket, and Frost & Jacobs (Cincinnati, Ohio) for appellees.

TERRELL, C. J.:

This case arises from the following facts. John Ringling was married to Emily Ringling (nee Emily Buck) in December, 1930. Four days before the marriage, Emily Buck loaned her fiance $50,000, taking his open note therefor and on the day of the wedding, they entered into an antenuptial agreement which will be discussed later. In July, 1933, John Ringling filed suit for divorce which he dismissed September 1, following. The consideration moving dismissal was set out in an agreement entered into between the parties which will be later discussed and referred to as the postnuptial agreement. In March, 1934, John Ringling filed a second suit for divorce. Before pleading to the merits of the second or present suit, two interlocutory appeals reached this Court, the first being from an order denying motion to quash the service, 117 Fla. 423, 158 So. 125, and the second being from an order denying a motion to dismiss the cause, 119 Fla. 210, 161 So. 406.

In May, 1934, John Ringling executed his will to which was attached a codicil dated November 2, 1935. In July, 1936, final decree of divorce was rendered and John Ringling died December 2, 1936. On December 22, 1936, Emily Ringling secured an order from the circuit court reviving the divorce suit against Ida Ringling North and others as heirs, devisees, executors, and trustees of the estate of John Ringling. On the same date, the order of revivor was granted, Emily Ringling entered her appeal from the final decree of divorce.

In February, 1937, Ida Ringling North and others against whom the divorce suit was revived, moved to vacate the order of revivor. This motion was denied

and appeal was prosecuted from that order. Appeal was also prosecuted from the order of revivor. On November 2, 1937, Emily Ringling applied to the chancellor for leave to file a bill in the nature of a bill of review, to examine and reverse the final decree of divorce. The chancellor denied said application and Emily Ringling appealed from that decree.

We are therefore confronted with four appeals, as follows: (1) The appeal of Emily Ringling from the final decree of divorce, (2) The appeal of Ida Ringling North, et al., for the order of revivor, (3) Appeal of Ida Ringling North, et al., from the order denying the motion to vacate the order of revivor, and (4) Appeal of Emily Ringling from the order of the chancellor denying her application to file bill in the nature of a bill of review.

The appeal from the final dceree of divorce is the main appeal. The appeal from the decree denying the application of Emily Ringling to file her bill in the nature of a bill of review is incidental to the main appeal. The two appeals having been consolidated by order of this Court will be treated together on the motion of appellees to dismiss. The second and third appeals involve the same phase of the main case and will necessarily be concluded by the disposition of the motion to dismiss.

We pass sub silentio the charges of bad faith and the verbal assaults of counsel on each other including aspersions they cast on litigants. If we did not know counsel to be such, the arguments and briefs in this case reveal a high degree of ability and industry and would drive us to the conclusion that they are very able lawyers.

The motion to dismiss is predicated on the theory that there being nothing but the marital status of the parties and no property rights whatever involved, the death of John Ringling rendered the divorce controversy moot. By the decided weight of authority in this country an appeal from a final decree of divorce cannot be prosecuted after the death of one of the parties when nothing but the marital status is involved. The one exception to this rule is the case in which in addition to the marital status there is also involved a controversy relating to the property rights of the parties. In such cases, the cause may be revived in the name of the heirs and personal representatives of the deceased spouse. This State recognizes both the rule and the exception. Price v. Price, 114 Fla. 233, 153 So. 904; Bell v. Bell, 181 U. S. 175, 21 Sup. Ct. 551, 45 L. Ed. 804.

This in fine is the whole theory of the case as contended by the representatives of John Ringling, but Mrs. Ringling has a very different story. She contends, (1) that the facts alleged and proven do not support the decree of divorce, and (2) that the first divorce suit was instituted for the purpose of securing a property settlement, that such a settlement was in fact secured and being so, it worked a condonation of all grounds for divorce alleged therein, that none of said grounds can be alleged or considered in the second suit for divorce and that when eliminated, there is no basis for the second suit as no grounds for divorce were proven to have taken place subsequent to August 31, 1933, the date the first suit was dismissed.

To clarify the atmosphere and place the parties in their appropriate setting, it is not out of place to say that this is not the usual divorce controversy that

reaches this Court. Neither is it the case in which a strong overbearing complainant is pursuing a friendless and helpless defendant. Both parties to this cause "knew their way around." If we may give faith and credit to the record, they were both wealthy in their own right; at the time of the marriage, he was sixty-two and she was forty-five; both had been married before, both had traveled extensively, were seasoned in experience, knew English in all its inflections, could call each other any kind of a name that the state of their temper prompted and whether called in the lingo of the drawing room, the boudoir, or the sawdust trail, the other was ready and did respond in kind. Some of the elements that induce marriage were totally lacking. It was treated as any other civil contract would be and has little on which the equities of domestic relations are usually invoked.

The chancellor who took the evidence and heard the case did not find that the first divorce suit was brought for the purpose of securing a property settlement. The final decree shows that three considerations actuated its dismissal. (1) It was dismissed at Mrs. Ringling's request and on her assurance that she would be kind to Mr. Ringling in the future. (2) Mr. Ringling secured from his wife a written agreement extending the due date of his $50,000 note before he agreed to the dismissal, and (3) The execution of the postnuptial agreement which restored Mrs. Ringling's dower in certain properties of the Ringling estate.

Appellant ignores the first of these considerations and contends that the second and third considerations inured solely to Mr. Ringling. Such is the basis on which she says that the first divorce suit was brought for the purpose of securing a property settlement. In

our view, the first of these considerations was mutual. She agreed to be kind, he to dismiss the divorce suit and both to resume the marital status. The second consideration was also mutual. Ringling got his note extended with the interest added but Mrs. Ringling got her new note secured with a mortgage on five paintings which counsel stated had been foreclosed and the note paid. The third consideration inured to Mrs. Ringling exclusively as we shall presently show.

It would be foolish to deny that with the settlement of the divorce controversy, there was also involved the settlement of a property controversy but that of itself did not render the latter the main element in the transaction. The settlement of divorce controversies, separation agreements, and property controversies have gone hand in hand ever since the good Master drew a rib from Adam's flank and created the first entrepreneur. When bounded by legal proprieties, such contracts have been approved by the courts in every civilized land. At the time of his agreement (August, 1933) Mr. Ringling was a sick man, he having in February, 1932, been stricken with an acute attack of thrombosis from which he never recovered though he had periods of improvement. In addition to this, Mrs. Ringling was pressing him to pay her note. If in reality the property settlement was the main element in the divorce settlement, we don't see that Mrs. Ringling is in position to complain. She got the payment of her note deferred without the loss of interest or principal but got it amply secured. She also got her dower rights in the Ringling estate, which she had previously released, restored. She now proposes to retain these benefits against the finding that she did not live up to her promise to be kind in the future.

These were the considerations on which the chancellor rejected Mrs. Ringling's theory of the case. It was also rejected by the Supreme Court and the Appellate Division of the Supreme Court of New York. Emily Ringling v. John Ringling North, et al., 4 N.Y.S. (2nd) 574.

Appellant's theory of condonation was also rejected by this Court in Ringling v. Ringling, 119 Fla. 210, 161 So. 406, wherein we held that a plaintiff in a second bill for divorce was not precluded from raising grounds alleged in a prior bill together with charges of subsequent similar conduct when past matrimonial offenses are conditioned on the future good behavior of the offending spouse.

On the question of condonation, the instant case is ruled by the case last cited. In fact, it is by no means settled that when a plaintiff enters into a property settlement and dismisses a divorce suit, he thereby condones all prior acts of the defendant and is precluded from raising them in a subsequent suit for divorce. The facts of the particular case will govern but certainly when the promise to be kind in the future is not made in good faith, nothing is condoned.

The general rule is that condonation is no longer a defense to a divorce suit if the condoned offense is repeated. The courts also agree that to revive a condoned offense the subsequent misconduct may be of milder nature and may be of different character from the conduct that was condoned. It is only necessary to show that the condonation was not accepted in good faith and upon the conditions implied. American Jurisprudence, Volume 17, page 258.

We have examined the cases relied on by appellant and they all relate to instances where forfeiture of

condonation was not shown. We understand the rule to be that condonation is always with the implied condition that the offense will not be repeated. So long as the offending spouse holds out and doesn't repeat the offense condoned, the second spouse is barred from seeking divorce on that ground but if repeated as in this case, the condonation is forfeited and the condoned offense may be renewed.

We do not hold that any kind of a property settlement in connection with divorce would be legal or warranted by public policy. We do hold that no legal objection is shown to the one under review. The law of this State, Section 5675 C.G.L. (3802) Revised General Statutes of 1927, authorizes any married woman to release her dower and certainly there was no objection in law or morals to the manner in which the status of the promissory note was changed. The treatment of the note and the restoration of dower were a pure business transaction incidental to the restoration of the marital status and were so treated by both parties at the time. The transaction was shown to have been voluntary and free from fraud and coercion.

Embedded in appellant's theory of condonation and property settlement, there is the further question of whether or not there was a controversy relating to the property rights of Emily Ringling involved in the divorce suit.

The answer to this question involves the interpretation of the pleadings, the ante nuptial agreement, the post nuptial agreement and the final decree of divorce. In the bill of complaint nothing was said about property rights. In the answer, Mrs. Ringling introduced the subject but later withdrew it so when the issues were made, the evidence taken and the final decree

entered, the subject of property rights was not before the court, was not considered, and no adjudication was made on that point. It is hardly necessary to say that issues which were not in the pleadings and were not considered by the trial court will be considered by this court.

The ante nuptial agreement was entered into on the day of but prior to the marriage. It recognizes that John Ringling had established the John and Mabel Ringling Museum of Art, at Sarasota, Florida, to which he had conveyed a large part of his estate. The agreement further announced that each of the parties thereto was financially independent and wealthy in their own right, that neither desired to participate in the estate of the other, that it was entered into in consideration of marriage and that each would in consideration of the covenants therein "surrender their rights, interest, dower, homestead, and courtesy in and to the estate and property of the other in whatsoever form or manner identified for all time, and that the promise of marriage herein contained, and its consummation by the performance of marriage is accepted in lieu of all right or interest that the one party may or otherwise have in the estate of the other in any form, whether during their lifetime or upon the decease of the one or the other, either as heir, legatee, distributee, homestead, dower, or courtesy."

The post nuptial agreement was entered into August 31, 1933, the day before the first divorce suit was dismissed. It is somewhat ambiguous but reaffirms the ante nuptial agreement in every particular and then announces that the release of dower was intended to apply only to the John and Mabel Ringling Museum. It then restores Mrs. Ringling's right to dower in all

the estate of John Ringling except the museum and the properties belonging thereto.

Appellant treats the ante nuptial agreement as a nullity and as having no effect on Mrs. Ringling's right to dower. There is not a line in it, however, that can be construed other than by it she released every right she had to dower in the estate of John Ringling in consideration of marriage. When read in connection with the post nuptial agreement, it is equally as certain that the effect of the latter was to restore her right to dower in all his estate but the museum properties. Except for the post nuptial agreement, Mrs. Ringling had no dower interest in the Ringling estate. Hence we say the third consideration for dismissing the first divorce suit inured exclusively to her. Whether or not it now exists depends on the effect of the final decree of divorce.

Appellant contends that the second divorce suit was brought for the purpose of circumventing the post nuptial agreement but the chancellor rejected this contention. The bill of complaint is predicated on the same grounds as the bill in the first suit, it being further alleged that similar acts of ill treatment were continued after dismissal. The court below and the New York courts held that part of the consideration for the post nuptial agreement was the dismissal of the first divorce suit and that such dismissal was by John Ringling done in good faith and not for the purpose of abrogating the post nuptial agreement. The chancellor found that Ringling dismissed the first suit on the promise of kind treatment in the future. We proffer no discussion of the evidence except to say that it amply supports the chancellor's decree. We do not imply that the evidence is free

from conflicts but when the whole current of this marital relation is reviewed as pictured by the ante nuptial agreement, the loan, the post nuptial agreement, the dismissal of the first divorce suit, the pleadings in both suits, and the findings of the chancellor, his decree was a perfectly logical conclusion to reach.

In the absence of statute saving it, a final decree of divorce puts an end to the wife's right of dower and is a complete defense to any claim for dower at the death of the husband. This is true regardless of which spouse secures the divorce. In the case at bar, no claim for dower was asserted at the time of the final decree of divorce, nor was it ever mentioned until after the death of John Ringling. It is now attempted to be reached by bill in the nature of a bill of review.

The motion for bill in the nature of bill of review is predicated on fraud, conspiracy, and perjury. It is alleged that John Ringling submitted false pleadings and perjured evidence in the procurement of his divorce and for the purpose of avoiding the legal effect of the post nuptial agreement. Other grounds relied on to support the motion have been disposed of and will not be treated here.

The alleged perjured evidence consisted in the procurement of some clinical charts by Frank Tomlinson and the making of faked entries on them by the nurse, Ina Sanders. These entries presumably represented fluctuations in Mr. Ringling's pulse during his illness. It is further contended that Mr. Ringling's bosom friend Frank Hennessy testified falsely as to professional visits of Dr. Ewald to Mr. Ringling between September 1, 1933, and the filing of the second bill

of divorce when in fact he did not attend him during that period.

The law is well settled that a divorce predicated on willfully false or perjured evidence will be vacated and set aside, but in this case the application to review fell short of the test required of such applications. It shows on its face that the evidence of Dr. Ewald could have been had when the evidence on the main question was taken and if the evidence of Ina Sanders and Frank Hennessy had been discredited, the charges of divorce would still have been amply supported. The proposed newly discovered evidence is largely cumulative and brings out no new or independent facts that would change the result.

This conclusion necessarily disposes of the two appeals addressed to the order of revivor. The final decree is accordingly without error so the motion to dismiss is granted.

It is so ordered.

WHITFIELD, CHAPMAN and THOMAS, JJ., concur.

BROWN, J., concurs in conclusion.

BUFORD, J., dissents.